A03A2435. IN THE INTEREST OF D. W., a child.
(595 SE2d 616)

PHIPPS, Judge.
The biological father of D. W. appeals the termination of his parental rights, arguing that the evidence was insufficient to support the termination and that the juvenile court failed to rule on his petition to legitimate the child. Finding no error, we affirm.

1. In order to terminate parental rights, the trial court must follow a two-step process.

First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that:

---

(1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. On appeal, we view the evidence in the light most favorable to support the trial court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated.[1]

The record shows that after a deprivation hearing in December 1999, the juvenile court found that D. W. — then two years old — was deprived because neither his mother nor his putative father (appellant) was able or willing to care for him. D. W.'s mother had abandoned him, and appellant had not legitimated him. Accordingly, the court awarded temporary custody of D. W. to his maternal aunt. Appellant consented to that judgment, and neither he nor D. W.'s mother appealed the deprivation order.

In June 2000, the juvenile court held a second deprivation hearing. It found that D. W.'s maternal aunt had been jailed "with no anticipated date of release," that appellant also was incarcerated, and that D. W.'s mother's whereabouts were unknown. The court again found that D. W. was deprived, and it awarded custody of him to the Georgia Department of Human Resources Division of Family and Children Services (DFCS). Neither appellant nor D. W.'s mother appealed the ruling. D. W. was placed in foster care.

In July 2001, DFCS petitioned to terminate the parental rights of appellant and D. W.'s mother. At the termination hearing in December 2001, former DFCS case manager Clair Pryor testified that she had handled D. W.'s case from November 2000 until August 2001. She testified that appellant had called her in November requesting custody of D. W. Appellant had come to her office, had met with D. W., and had discussed with her the steps he would need to take to obtain custody of D. W. Before DFCS could develop a written reunification case plan for appellant, however, he had, in Pryor's words, "los[t] interest in it." Although DFCS had scheduled twice-monthly visits for appellant and D. W., appellant had met with D. W.

---

[1] (Footnotes omitted.) *In the Interest of A. T. H.*, 248 Ga. App. 570-571 (1) (547 SE2d 299) (2001).

only once more — in January 2001. Thereafter, according to Pryor, appellant had "dropped out of sight. And then . . . he went to prison."

Pryor testified that when she first met D. W. in November 2000, he had seemed "very closed off" and would not interact or make eye contact with people. He had exhibited "animal behavior," such as making noises or kicking and punching to get what he wanted, and he had shown "some emotional problems." But after being placed with his current foster parents in March 2001, D. W. had improved a "great deal." He had seemed calmer, and he had developed a bond with his foster parents.

Vicky Horton, another DFCS caseworker, testified that she had taken over D. W.'s case in August 2001. Appellant had never tried to contact her, nor had he contacted D. W., supported him financially, or sent him any gifts. Horton testified that D. W. seemed stable and comfortable in his foster home, that the foster parents wanted to adopt him, and that DFCS would support the adoption.

D. W.'s foster mother testified that when D. W. initially came to her home, he had been shy and afraid that he would not be able to stay there. Over time, however, D. W. had become more secure and outgoing. The foster mother testified that D. W. got along well with her husband, and that they wanted to adopt him.

Appellant's mother testified that D. W. had lived with her briefly while he was an infant, and that she had continued to visit him regularly thereafter. She testified that although D. W. used to be "full of anger" and "stress[ed] out," he had "changed tremendously" in his current placement and seemed happy. She favored allowing the foster parents to adopt D. W., and she felt that appellant was not able to provide proper care for D. W. and had made no progress toward obtaining a stable home for the child.

Dr. Harvey Gayer, a child psychologist, testified that he had evaluated D. W. in October 2000 and December 2001. After the first evaluation, Gayer concluded that D. W. had a "disruptive behavior disorder" that included "a combination of symptoms from oppositional defiant disorder and conduct disorder categories." Gayer recommended that D. W. be placed in a home with a strong structure, stability, clear limits, consequences for inappropriate behavior, and close adult supervision. After the second evaluation (at which point D. W. had been with his current foster parents for seven months), Gayer noted "significant improvement." He testified that D. W. had "settled down" into a supportive foster care placement and no longer showed symptoms of behavior disorder.

Appellant testified that he had been incarcerated three times, for a total of approximately eleven months, since D. W.'s birth. At the time of the deprivation hearing, he had been incarcerated for nine months, awaiting trial on charges of felony murder. Although appel-

lant claimed to want a relationship with D. W., he admitted that he had last visited the child in January 2001 (even though his most recent incarceration had not begun until April 2001) and that he had never provided any child support. Appellant stated that he wanted D. W. to be placed with his wife, who was not present at the termination hearing and who had seen D. W. only "a few times."

Appellant also testified that he had filed a petition to legitimate D. W. in December 1999. At the time of the termination hearing, no action had been taken on the petition. Appellant testified that he had not called his attorney, the court, or DFCS to determine the status of the petition. At the beginning of the termination hearing, the juvenile court stated that it did not know why the legitimation petition had not been ruled upon, but that it would "leave it for now."

D. W.'s guardian ad litem submitted a report to the juvenile court stating that D. W. appeared to be thriving in a stable foster home and recommending that the parental rights of appellant and D. W.'s mother be terminated.

Taking judicial notice of the two previous unappealed deprivation orders, the juvenile court concluded that D. W. was deprived. It also concluded that the deprivation resulted from a lack of proper parental care and control. Specifically, the court found that appellant and D. W.'s mother had "fallen miserably below the standard of care necessary to rear a child" and had, "at best, a superficial interest" in D. W. The court also concluded that the cause of D. W.'s deprivation was likely to continue because "the parents' absence and indifference as to the child's needs since placed in [DFCS's] custody show that it is reasonable to expect that this inattention is likely to continue in the future." The court found that appellant "has not contributed in any meaningful way to his child's development." Finally, the court concluded that termination was in D. W.'s best interest, given his stable placement with a foster family who intended to adopt him. Because these findings are supported by clear and convincing evidence, we uphold them.[2]

Appellant complains that the juvenile court focused myopically on his incarceration, which is insufficient, standing alone, to justify termination of his parental rights. But appellant's incarceration did not stand alone. The evidence showed that appellant made little effort, even when he was not incarcerated, to establish a meaningful relationship with D. W. After the child was placed in the custody of DFCS, appellant visited him only twice and offered no financial support. And there was little evidence that appellant had taken any

---

[2] See, e.g., *In the Interest of D. A. P.*, 234 Ga. App. 257, 258-260 (506 SE2d 438) (1998).

steps to establish a stable home for D. W. These aggravating circumstances justified the termination of appellant's parental rights.[3]

Appellant's other arguments are equally unavailing. He asserts that there was no evidence to support the court's finding that "excessive use of alcohol and/or drugs contributes to the deprivation" of D. W.; but even if that particular finding lacked an evidentiary basis, the record is rife with other evidence to support the court's conclusion that D. W.'s deprivation was caused by lack of proper parental care and control. As for appellant's complaint that he never received a written case plan, the DFCS caseworker testified that he lost interest in the process before a case plan could be developed. Finally, we find no fault with the court's conclusion that appellant failed to timely legitimate D. W. Although appellant did file a legitimation petition, he took no further steps to pursue legitimation, not even attempting to determine the status of that petition.

2. Appellant contends that the juvenile court erred by not ruling on his petition to legitimate D. W. before terminating his parental rights. But he cites no authority showing that the court was required to address the legitimation petition first. Additionally, appellant has not shown that he was harmed by the court's failure to consider the petition. It is apparent from the court's termination order that the court considered appellant's failure to timely legitimate D. W. to be further evidence of his lack of interest in the child. But it is equally clear that the court's decision did not rest primarily — or even substantially — on appellant's failure to legitimate D. W.[4] Accordingly, we find no reversible error.

*Judgment affirmed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED FEBRUARY 23, 2004.

*David T. Wooten*, for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General*, for appellee.

---

[3] See id.; *In the Interest of C. N. S.*, 248 Ga. App. 84 (545 SE2d 633) (2001); *In the Interest of B. C.*, 235 Ga. App. 152 (508 SE2d 774) (1998).

[4] See *In the Interest of K. W.*, 262 Ga. App. 744, 748 (3) (586 SE2d 423) (2003).